UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMILIANO ISIDRO ENRIQUEZ, | Case No. 1:21-cv-00930-JLT-HBK (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY [1] |
| v. | |
| R. GODWIN, | |
| Respondent. | FOURTEEN-DAY OBJECTION PERIOD |

## I.  STATUS

Petitioner Emiliano Isidro Enriquez ("Petitioner" or "Enriquez"), a state prisoner, is proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on June 14, 2021.  (Doc. No. 1, "Petition").  Petitioner challenges convictions after a jury trial for murder in violation of Penal Code § 187(a) and possession of a firearm as a felon in violation of Penal Code § 12021(a)(1), for which he was sentenced by the Tulare County Superior Court to an aggravated term of three years for the fire arm possession plus four years for a gang enhancement pursuant to Penal Code § 186.22(b)(1)(A), a consecutive term of life without the possibility of parole for the murder, and an additional consecutive term of twenty-five years to life for a firearm

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

1    enhancement pursuant to Penal Code § 12022.53(d).  (Case No. VCF298155).  (Doc. No. 12-3 at

2    195; Doc. No. 12-15 at 3).[2]  The Fifth Appellate District Court remanded the matter to the trial

3    court to permit it to consider striking the gun enhancement, but otherwise affirmed Enriquez's

4    judgment on direct appeal.  (Case No. F073236).  (Doc. No. 12-15 at 36).  On July 10, 2019, the

5    California Supreme Court summarily denied Enriquez's petition for review (Case No. S255982).

6    (Doc. No. 12-18).

7            The Petition presents the following (restated) grounds for relief:

8                     (1) The trial court's denial of Petitioner's motion to set aside the
                      Information pursuant to Penal Code § 995 denied him of due
9                     process.

10                    (2) The prosecution failed to prove its umbrella-gang theory.

11                    (3) There was insufficient evidence to support the gang
                      enhancement.
12

13                    (4) The trial court failed to properly instruct the jury regarding the
                      umbrella-gang theory.

14                    (5) The prosecution's gang expert's testimony included testimonial
                      hearsay in violation of *People v. Sanchez*, 63 Cal. 4th 665 (2016)
15                    and the confrontation clause.

16                    (6) There was insufficient evidence to support the primary activities
                      requirement of the gang enhancement.
17

18                    (7) The evidence did not support giving a jury instruction regarding
                      aiding and abetting.

19                    (8) The reliance on uncorroborated accomplice testimony violated
                      due process.
20

21   (*See generally* Doc. No. 1 at 5-10, 16-40).

22            Respondent filed an Answer (Doc. No. 11), arguing Petitioner was not entitled to relief on

23   any of his grounds, and lodged the state court record in support (Doc. No. 12, 12-1 through 12-

24   18) as supplemented (Doc. No. 16).  Petitioner elected not to file a reply.  This matter is deemed

25   submitted on the record before the Court.  After careful review of the record and applicable law,

26   the undersigned recommends the district court deny Petitioner relief on his Petition and decline to

27   _____

28   [2] All citations to the pleadings and record are to the page number as it appears on the Case Management
     and Electronic Case Filing ("CM/ECF") system.

1    issue a certificate of appealability.

2    **II.    GOVERNING LEGAL PRINCIPLES**

3    **A.    Evidentiary Hearing**

4    In deciding whether to grant an evidentiary hearing, a federal court must consider whether

5    such a hearing could enable an applicant to prove the petition's factual allegations, which, if true,

6    would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474

7    (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise

8    precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Id*.  Here,

9    the state courts adjudicated Petitioner's claims for relief on the merits.  This Court finds that the

10   pertinent facts of this case are fully developed in the record before the Court; thus, no evidentiary

11   hearing is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

12   **B.    ADEPA General Principles**

13   A federal court's statutory authority to issue habeas corpus relief for persons in state

14   custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

15   Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

16   first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

17   the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

18   of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

19   the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

20   *Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits

21   relief on a claim adjudicated on the merits, but only if the adjudication:

22   
23          (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

24   
25          (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

26   28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

27   *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

28

"Clearly established federal law" consists of the governing legal principles in the decisions of the United States Supreme Court when the state court issued its decision. *White*, 572 U.S. at 419. Habeas relief is appropriate only if the state court decision was "contrary to, or an unreasonable application of," that federal law. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" clearly established federal law if the state court either: (1) applied a rule that contradicts the governing law set forth by Supreme Court case law; or (2) reached a different result from the Supreme Court when faced with materially indistinguishable facts. *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003).

A state court decision involves an "unreasonable application" of the Supreme Court's precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct[,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court recently explained, while the

4

1  passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't

2  eliminate *Brecht's* actual-prejudice requirement. *Brown v. Davenport*, ⸺ U.S. ⸺, 142 S. Ct.

3  1510, 1524, 212 L.Ed.2d 463 (2022). In other words, a habeas petitioner must satisfy *Brecht*,

4  even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether

5  or not' AEDPA applies.") (*citing Fry v. Pliler*, 551 U.S. 112, 121 (2007)). In short, a "federal

6  court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA.

7  But to grant relief, a court must find that the petition has cleared both tests." *Id.* at 1524.

8      As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been

9  an "adjudication on the merits" in state court. An adjudication on the merits does not require that

10  there be an opinion from the state court explaining the state court's reasoning. *Richter*, 562 U.S.

11  at 98. "When a federal claim has been presented to a state court and the state court has denied

12  relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

13  of any indication or state-law procedural principles to the contrary." *Id.* at 99. "The presumption

14  may be overcome when there is reason to think some other explanation for the state court's

15  decision is more likely." *Id.* at 99-100. This presumption applies whether the state court fails to

16  discuss all the claims or discusses some claims but not others. *Johnson v. Williams*, 568 U.S.

17  289, 293, 298-301 (2013).

18      While such a decision is an "adjudication on the merits," the federal habeas court must

19  still determine the state court's reasons for its decision in order to apply the deferential standard.

20  When the relevant state-court decision on the merits is not accompanied by its reasons,

21      the federal court should "look through" the unexplained decision to
22      the last related state-court decision that does provide a relevant
       rationale. It should then presume that the unexplained decision
23      adopted the same reasoning. But the State may rebut the
       presumption by showing that the unexplained affirmance relied or
24      most likely did rely on different grounds than the lower state court's
       decision, such as alternative grounds for affirmance that were
25      briefed or argued to the state supreme court or obvious in the record
       it reviewed.

26  *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). The federal court "looks through" the silent state

27  court decision "for a specific and narrow purpose—to identify the grounds for the higher court's

28  decision, as AEDPA directs us to do." *Id.* at 1196.

III.    **RELEVANT FACTUAL BACKGROUND**

The Court adopts the pertinent facts of the underlying offenses, as summarized by the California Fifth District Court of Appeal.  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

### FACTS

**Curtis B.'s Testimony**

During the lunch hour on November 17, 2008, Curtis B. was driving west on Mill Creek Avenue towards Lovers Lane. Curtis was driving with his window down when he heard "a couple loud pops" along the sidewalk at a park. There were two vehicles in the area, both facing east on Mill Creek. A person in a black hoodie was standing next to the open driver's side window of the vehicles. The person then ran to the other vehicle – a small SUV – and entered it on the driver's side. The small SUV then sped away headed east on Mill Creek. Curtis checked the remaining vehicle, saw a person inside, and called 911.

Curtis told law enforcement that the individual he saw was Hispanic, with a medium skin tone, thin build, and was approximately 5 feet 7 inches or 5 feet 8 inches tall. He also provided a partial plate: "5XA." He did not recall seeing the color red or hearing anything like "Norte."

**Kirk M.'s Testimony**

When the incident occurred, Kirk M. was 14 years old. Kirk was working on his homework at Mill Creek Park with his sister, Ashley. Kirk heard "a couple loud noises" and saw a male in a dark, hooded sweatshirt get into the driver's seat of a vehicle and drive away. The male was not wearing red. Kirk checked inside another vehicle nearby and observed its occupant was dead. Other testimony established the victim was Pedro Nunez, a Walmart employee who had been on his lunch break.

**Ashley M.'s Testimony**

Ashley said she heard "a few loud noises," prompting her to turn around. She saw a male in a black hoodie get into the driver's side of a vehicle, which then sped off. Ashley had seen the vehicle parked at Mill Creek Park before. The vehicle had "custom nonstock wheels."

Ashley did not see any red or blue clothing on the man wearing the hoodie, nor did she hear any "dialogue."

**Michelle M.'s Testimony**

Michelle M. was returning to work from lunch around 12:25 p.m. when she turned onto Mill Creek. She saw a "young man" in a gray

sweatshirt standing outside of a white car, which was next to, and behind, a black car. The young man "looked kind of scared and guilty, like something had just happened." The man was "Hispanic, light-skinned, young, early 20s, slight build." He had dark hair, was clean-shaven and was no taller than 5 feet 9 inches tall. Michelle saw the man then enter the passenger side of a Dodge vehicle.

Michelle did not see the young man wearing any red clothing, nor did she hear him say anything.

**Officer Howerton's Testimony**

Police Officer Howerton testified that he took Michelle M.'s statement on the day of the murder. Michelle told Howerton that the man she saw was a "[l]ight complected [*sic* ] Hispanic male wearing a gray baggy long-sleeved shirt, plaid shorts, with white socks up to his knees, with white shoes, approximately 5′6″ to 5′8″ inches tall." Michelle was sure that the vehicle she saw was a Dodge Caliber.

**Richard G.'s Testimony**

Richard G. was on Mill Creek Drive, waiting to make a left turn onto Lovers Lane, when he noticed two vehicles. A white vehicle with a driver inside was parked next to a curb. A black Dodge Caliber was parked "just adjacent to him and just behind him." The front driver's door on the Dodge Caliber was open and a man was approaching the white vehicle.

Richard heard two gunshots. He saw a person standing with his hand inside of the white car. As the person withdrew his hand, Richard saw a black, small-caliber gun. The person entered the driver's door of the Dodge Caliber and "took off" eastbound on Mill Creek. The person was wearing a black hooded sweater and shorts.

Richard went to check on the person in the white vehicle and saw that he appeared to be deceased. Richard called 911 and drove off to find the Dodge Caliber. He eventually found what he believed to be the suspect vehicle in a cul-de-sac. A man exited the vehicle from the rear driver's side door and went to a "small dirt area." The vehicle made a U-turn and the man got back into the vehicle. The vehicle left, and Richard eventually lost sight of it.

Richard believed he told officers that day that the shooter had a ponytail, was light-skinned, around 160 pounds, and was 5 feet 8 inches or 5 feet 9 inches tall. He later told officers that the shooter had a braid going down the back of his head to his shoulders and his hair was shaved down the sides. At the time of the incident, however, Richard told officers the shooter's hair was "black, short, and stubby." Richard did not recall telling law enforcement that the person wore any red clothing, made any hand gestures suggesting gang membership, or said any gang epithets.

////

7

**Autopsy**

The autopsy revealed that the victim, Pedro Nunez, was shot once through the left side of his neck and once through his chest. The first wound was nonfatal, the second was fatal.

**Crime Scene Evidence**

James Potts, an identification technician with the Visalia Police Department, was assigned to assist in the crime scene investigation. Potts identified two spent shell casings stamped "R-P 9mm Luger" on the roadway near the driver's door. Projectiles were recovered from the victim's body: one from the chin and another from the back.

A black hooded sweatshirt, size 2 XL, was found in a cul-de-sac "maybe a half mile" from where Nunez had been shot and killed. Particles characteristic of gunshot residue were later found on the sweatshirt. The sweatshirt was sent for DNA testing to the Department of Justice laboratory in Fresno.

There were no suspects in the case until two years later, when the Department of Justice notified police of a DNA hit on the sweatshirt. Stains on the sweatshirt contained DNA from at least three individuals, including a man named Paulino Franco. Defendant's DNA was not found on the sweatshirt.

**Paulino Franco's Testimony**

Around summer of 2006, Franco began to spend time with defendant. Both men associated with northern gangs.

On November 17, 2008, Franco was drinking at Sergio Saucedo's house. Defendant came over, driving his girlfriend's car. Defendant drove Saucedo and Franco to Woodlake. They stopped at a house, and defendant came back "angry." Defendant asked to borrow Franco's sweatshirt, and Franco obliged. Defendant then went into a store and bought alcohol. At some point, Saucedo's brother Juan Chavez also entered the vehicle. The group drove to Golden West, then towards Lovers Lane. While he was driving, defendant said, "'Did you see that?'" and made an aggressive U-turn. Defendant pulled behind a vehicle and got out. He walked up to the vehicle in front of them, paused, and then shot its occupant. Defendant ran back to the car, and Franco saw a black gun in his hand. Someone – presumably defendant – threw Franco's sweatshirt to him and told him to throw it out. Franco got out of the car and threw away the sweatshirt. Defendant then came back, picked up Franco, and drove to Sergio's house.

Franco did not remember what defendant was wearing at the time. Franco did not tell officers that he heard anyone say "Norte" or anything like that.

One of the directives of the Norteño street gang was to attack, on sight, people perceived as Southern gang members. A northern

8

1  gang member who sees a 20 to 25-year-old, Hispanic male with a
   shaved head wearing dark blue would think that person is a
2  Southern gang member.

3  **Sergio Saucedo's Testimony**

4  Saucedo first met defendant when he was 12 or 13 years old. They
   developed a close friendship, and would drink, smoke "weed," and
5  go on "joy rides" together.

6  In November 2008, Franco was staying with Saucedo. Saucedo saw
   Franco with a nine-millimeter P226 firearm.

7

8  Saucedo testified that the group had not discussed looking for
   Sureños that day. But Saucedo admitted to previously telling the
   prosecutor that their intention that day was to go get "the
9  opposition." The "opposition" referred to Sureños.

10 Saucedo testified he was "very intoxicated" on the day of the
   incident. At some point that day, Saucedo, defendant and Franco
11 were in a vehicle together. Saucedo could not remember who else
   was in the vehicle, but he "believe[d]" Chavez was present as well.

12

13 Defendant was driving, Franco was sitting on the passenger side.
   They pulled up behind a vehicle and Franco exited the front
   passenger seat. Franco pulled a nine-millimeter handgun out of the
14 black sweater he was wearing and shot the other vehicle's occupant
   twice. Franco then returned to the vehicle they came in and entered
15 the front passenger seat. Later, Franco got out of the vehicle and
   "got rid" of the sweater he had been wearing.

16
   None of them were saying "Norte" or anything like that.
17
   Saucedo admitted that in prior statements to law enforcement, he
18 had identified defendant as the shooter.

19 **Defendant's Testimony**

20 Defendant drove Jessica's car to Sergio's house. Sergio and
   defendant drank beer together. At one point, they became "bored"
21 and "decided to take a cruise." They had no particular destination in
   mind.
22
   Defendant was driving, and Franco was in the rear driver's side
23 seat. Franco was wearing a black sweater and shorts. Chavez and
   Sergio were also in the car. The group decided to hang out at the
24 park because they had nothing to do. Defendant pulled over behind
   a car and did not know anyone was inside it. They sat there for 15
25 or 20 minutes, when "one of [defendant's] friends jump[ed] out of
   the car, goes up to this other car, talking to somebody in the front."
26 At some point, Franco shot the occupant of the other car, holding
   the gun in his left hand. Defendant thought he heard three shots.
27 Franco ran back to the car, got into the rear driver's side seat, and
   screamed at defendant to drive away. Defendant screamed, "'What
28 did you do?'" and drove away. After driving a little ways,

9

defendant "got up the nerve to kick [Franco] out" of the car and told him, "[G]et the f[**]k out of my car." Franco exited and disappeared out of sight. Eventually, Franco got back into the car wearing a long, gray shirt. He no longer had the black sweatshirt.

Defendant claimed he never spoke with Franco or Sergio about hunting Sureños; did not know what color shirt the victim had on, or what type of hairdo the victim had. Defendant also testified he was not a Northern gang member before he went to prison, but he did become one in prison.

**Search of Defendant's Residence**

Detective Ford searched defendant's residence on April 9, 2014. Ford observed numerous hats "consistent with gang indicia," along with a neatly folded red bandana and other red clothing. Ford also observed that while defendant's driver's license listed him at 180 pounds, he was actually "well over" 200 pounds and was "very stout, very physically fit, and very muscular."

When defendant was booked into jail that day, several pictures of his body were taken. Those pictures depicted several tattoos, including one that read: "187 murder." Defendant testified that he received the tattoo after Nunez was killed, but claimed that it was unrelated.

**Prosecution's Gang Expert**

Officer Logan testified as the prosecution's gang expert. At the time of trial, Logan had been a sworn peace officer for 10 years and had been with Visalia's gang suppression unit for four and a half years. Logan specializes in the Norteño and Sureño gangs.

Officer Logan explained the Norteño gang originated from another group called Nuestra Familia, which began in the late 1960's. Norteños associate with the color red and the number 14. Around Visalia, the Norteños's enemies are the Sureños, who display the color blue and associate with the number 13.

Officer Logan found that defendant had several significant tattoos, including a "huelga bird," "VWL" on his back, and "187 murder." Nuestra Familia adopted the huelga bird as a symbol from the farm workers movement.

Officer Logan opined that Franco, Saucedo and defendant were Norteño gang members at the time of the murder. Logan's opinion as to defendant was based on prior contacts (including the clothing he was wearing and who he was with), tattoos, and the circumstances of the present crime.

Officer Logan reviewed "a listing" of Franco's prior contacts with law enforcement, including the following. On December 21, 2004, Franco was in a car with other gang members, and "they" shot at the windows of another car with a BB gun. On July 8, 2008, a law enforcement officer contacted Franco with defendant, who was

wearing a red shirt. Logan also considered "a May 20th, 2007, case involving a possession of a firearm and some ammo and a hat with 'Visalia' on it." In a field interview with an Officer Brumley, Franco said he was a Norteño gang member and had earned his way into the gang by fighting. Logan testified he had considered a "March 15, 2008, case where Paulino Franco was driving too fast, got yelled at by somebody, stopped his car that he was driving with a red bandana over his face, and simulated a handgun and asked, "'Who wants some?'" Finally, Logan considered "an August 3, 2009, case, where [Franco] was arrested during a car stop and searched and live ammo for a .38 was found, as well as Northern gang clothing and other evidence" including an empty nine-millimeter magazine.

With respect to Saucedo, Officer Logan considered an October 29, 2004, case involving a fight between Norteños and Sureños. On October 27, 2005, Saucedo was arrested for his involvement in a fight at a middle school involving other Norteño gang members. On January 24, 2008, Saucedo was contacted with other North Side Visa gang members. Saucedo admitted at that time that he was an active North Side Visa Norteño. On March 21, 2008, Saucedo admitted he was on probation for a gang crime and admitted that he had been a Norteño all his life. Saucedo was also contacted with fellow gang members on May 12, 2008, and October 30, 2008. On April 26, 2009, Saucedo and two Norteño gang members committed a burglary. On November 2, 2009, Saucedo was arrested with another Norteño gang member, as they were in possession of a .22-caliber handgun. A probation report dated May 2, 2010, indicated that Saucedo had been in possession of gang writings. During field interviews on July 22, 2010, August 19, 2010, and November 4, 2010, Saucedo admitted associating with Norteño gang members. Saucedo was contacted on July 29, 2010, with Daniel Hanson who was arrested for possessing a TECH 9 assault pistol. On September 3, 2010, an Officer Speer observed Saucedo in an altercation. Saucedo said he was an active Northerner and "wasn't going to have anyone, quote 'talking s[**]t,' about them." On December 3, 2010, Saucedo was contacted in possession of a folded red bandana.

Franco and Saucedo belonged to the North Side Visa clique of Norteños. Defendant belonged to the Woodlake clique of Norteños. Officer Logan was not personally aware of an instance where members of the Varrio Woodlake Locos and North Side Visalia cliques associated together to commit a crime in 2008.

Officer Logan testified that if multiple gang members are in a vehicle, each member has an obligation to tell the other active gang members if they are carrying a gun.

Officer Logan testified the victim, Nunez, was not a southern gang member.

////

////

11

**Defense Gang Expert**

The defense gang expert opined that a hypothetical murder with similar facts to the present case would not be gang-related. The expert testified that there was no evidence "of direction from a higher-up, a note, a writing, a recording." The expert also noted that "if you're going to commit a crime or an alleged gang crime and nobody knows the gang did it, there's no fear." The expert opined that he "[did] not see gang benefit of this event."

(Doc. No. 12-15 at 3-12 (footnotes admitted)).

## IV.    ANALYSIS

Respondent acknowledges that each of Petitioner's grounds were raised on direct appeal to the Fifth Appellate District Court and denied on the merits, then subsequently raised and summarily denied by the California Supreme Court.  Thus, each ground is exhausted, and the Court looks through to the Fifth Appellate District's reasoned decision in evaluating each of Petitioner's claims under the deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

### A.    Ground One-Denial of § 995 Motion

In his first ground, Petitioner asserts the trial court improperly denied his § 995 motion challenging the gang enhancement and special-circumstances allegations in the information because they were not supported by the evidence presented at the preliminary hearing.  (Doc. No. 1 at 16-20).  Petitioner asserts this alleged error allowed prejudicial and irrelevant gang evidence to be presented at trial.  (*Id.* at 20-23).  Respondent argues this state law claim is not cognizable on federal review.  (Doc. No. 11 at 25-26).  To the extent a federal claim exists, Respondent argues sufficient evidence was presented at the preliminary hearing to hold Petitioner over for trial.  (*Id.* at 26).

"The habeas statute 'unambiguously provides that a federal court may issue a writ of habeas corpus to a state prisoner only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'"  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal citations omitted).  Thus, "'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'"  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (internal citations omitted); *Swarthout*, 562 U.S. at 219 ("[F]ederal habeas corpus relief does not lie for errors of state law.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, Petitioner's ground one challenges the state court's findings under California Penal Code § 995, which provides that an indictment or information "shall be set aside by the court in which the defendant is arraigned, upon his or her motion," if it was not supported by reasonable or probable cause.  Accordingly, Plaintiff's ground one is based on an alleged violation of state law.  Federal habeas claims challenging the denial of motions under California Penal Code § 995 are not cognizable.  *Lopes v. Campbell*, 408 F. App'x 13, 15 (9th Cir. 2010).  To the extent Petitioner's ground one can be read as challenging whether evidence was properly admitted at trial, it is well-settled that issues of state law admissibility are also not cognizable on federal habeas review.  *See Johnson v. Sublett*, 63 F.3d 926, 931 (9th Cir. 1995) (denying habeas relief based on claim that admission of wooden clubs found at defendant's house was unconstitutional due to lack of evidence linking clubs to crimes because claim merely "present[ed] state-law foundation and admissibility" issues).

Accordingly, the undersigned recommends that ground one be dismissed for failure to state a cognizable federal claim.

### B.    Grounds Two, Three, and Six-Sufficiency of the Evidence[3]

In grounds two, three, and six, Petitioner challenges the sufficiency of the evidence to support varying aspects of his convictions. In ground two, Petitioner argues there was insufficient evidence to support the prosecution's "umbrella-gang theory" because the predicate offenses described by the gang expert were not committed by the gang to which he belonged.  (Doc. No. 1 at 23).  Similarly, in ground three, Petitioner argues there was insufficient evidence to support that the homicide was committed to benefit a gang.  (*Id.* at 26-27).  Ground six challenges the evidence supporting the primary activities element of the gang enhancement.  (*Id.* at 31-33).

Respondent argues that the state appellate court reasonably rejected Petitioner's arguments, and the rejection was neither contrary to, nor an unreasonable application of, federal law.  (Doc. No. 11 at 32-33, 35-36, 44).

---

[3] In the interest of efficiency, the Court addresses ground six out of order given that grounds two, three, and six all present challenges to the sufficiency of the evidence.

1

2

**1. State Court Decision**

In denying Petitioner's insufficiency claims, the Fifth Appellate District court found as

follows:

**IV. Defendant has Failed to Establish Error Under *People v. Prunty***

*A. Background*

Officer Logan testified he "look[ed] at" seven predicate offenses.

**1. <u>First Predicate Offense</u>**

Officer Logan was shown prosecution exhibit 95, a "certified conviction" of a crime that occurred on January 7, 2007. When asked if he was "familiar with the underlying facts of that particular case," Logan said he was. Logan then described the crime in pertinent part:

> "[T]hree males show up to a party, which is composed of numerous Norteno gang members and associates. The three males in [a] truck are identified by people at the party as being Sureno gang members. When they arrive, some of the partygoers refer to the Sureno as being scraps, which is a derogatory term that Northerners use to insult Surenos. At that point words are exchanged. [¶] The Nortenos start throwing beer bottles at the car, and a gunfight ensues between both the Surenos and the Nortenos. During the incident one of the Nortenos was struck in the back of the head by pretty much friendly fire and killed."

**2. <u>Second Predicate Offense</u>**

Officer Logan was then shown two exhibits and asked whether they reflected "a conviction for voluntary manslaughter" as to Richard Contreras and Javier Solis. Logan responded affirmatively. Logan was then asked if he was "familiar with that case," and Logan responded he was.

Logan testified that Norteño gang members, Javier Solis and Richard Contreras, confronted Matthew Manes, and an altercation ensued. One of the two assailants yelled "Norte" – or something to that effect – and stabbed Manes to death.

////
////

14

### 3. <u>Third Predicate Offense</u>

Officer Logan was shown another exhibit and was asked whether it was "a certified prior conviction for attempted murder with gang and great bodily injury" with respect to a crime in Woodlake on November 11, 2007. Logan responded affirmatively.

Officer Logan was then asked, "What can you tell us about that case?" Logan said that officers responded to a vandalism at a residence in Woodlake. They found a Sureño gang member who had been stabbed. A man named George Castenada was convicted of "attempted homicide" with a gang enhancement.

Officer Logan testified that Woodlake has a Norteño clique called Varrio Woodlake Locos.

### 4. <u>Fourth Predicate Offense</u>

Officer Logan was then asked if he was familiar with two certified convictions pertaining to Christopher Aguilar and Pete Gallegos. Logan responded he was. Logan was asked if he was "familiar with that taking place on May 16, 2008, in the jail." Logan replied, "[Y]es."

Officer Logan was then asked "what that consisted of." Logan explained Gallegos and Aguilar were in a cell at the Tulare County pretrial facility when they asked Javier Delrio if he was a Southerner or a Sureño and then attacked him.

### 5. <u>Fifth Predicate Offense</u>

Officer Logan was shown another exhibit and asked if it was "a conviction for Brandon Flores for first degree murder with a special circumstance of gang for a murder that took place on August 16, 2007." Logan responded it was.

Officer Logan was then asked to tell the jury what the facts were behind the conviction. Logan explained that Daniel Saesee was walking when several people accosted him and asked him if he was in a gang. The people were "insinuating he is a member of the Oriental Troops, which is the Crips, and the rival of the Nortenos." One of the people shot Saesee, and then they all rode off on their bikes.

### 6. <u>Sixth Predicate Offense</u>

Officer Logan was shown two more exhibits and asked if he was

15

familiar with "these two convictions" of first degree murder. Logan replied that he was.

Officer Logan was then asked if he was familiar with the underlying murder, which took place on May 19, 2010. Logan replied he was. Logan said that Jacob Robles and Julian Gonzales "were members of a hit squad who were tasked by, at that time, the person in charge of security for the city of Visalia, Joe Dominguez." "They were tasked with killing a Northern dropout, who goes by the moniker Cody, whose real name is Felix Estrella." They killed shot someone who turned out not to be Cody.

### 7. Seventh Predicate Offense

Officer Logan was shown two additional exhibits and asked if he was familiar with the convictions of Adrian Esquer and Anthony Hanson for multiple attempted murders taking place on January 27, 2012. Logan was then asked if he could "tell us what that was about." Logan said Chris Burris, a North Side Varrio Loco was at the mall with his girlfriend and child. He was approached by a group of Sureños and words were exchanged. Burris called for fellow gang members, who then drove to the mall. Esquer and Hanson approached the Sureños in a candy store. Esquer then fired a .22-caliber handgun into the candy store, striking "one of the associates" and an "innocent civilian."

### B. Analysis

In *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), the Supreme Court held that "the gang the defendant sought to benefit ... and the group whose actions the prosecution alleges satisfy the ... predicate offense requirements of section 186.22(f), must be one and the same." (*Id.* at pp. 75–76.) In other words, prosecutors cannot show that defendant intended to benefit one gang while relying the predicate offenses of another gang to satisfy the statutory requirements.

Defendant argues that only one predicate offense involved the Varrio Woodlake Locos subset to which he allegedly belonged. This fact is not dispositive. While defendant's "VWL" tattoo indicated he was a member of the Varrio Woodlake Loco clique, there was also evidence defendant simultaneously associated directly with the broader Norteño gang, and that he intended to benefit the Norteño gang by killing a perceived rival. *Prunty* does not prohibit the prosecution from proving the defendant sought to benefit a gang (i.e., the Norteños) while relying on predicate offenses by the *same* gang (i.e., Norteños).

16

Moreover, *Prunty* permits the prosecution to rely on the conduct of multiple gang subsets if it "introduce[s] evidence showing an associational or organizational connection that unites members of a putative criminal street gang." (*Prunty*, *supra*, 62 Cal.4th at p. 67.) "The prosecution has significant discretion in how it proves this associational or organizational connection to exist ...." (*Ibid.*) For example, Norteño subsets do not need to interact with one another and may even be "unaware of one another's activities" if "each subset contains a 'shot caller[ ]' who 'answer[s] to a higher authority' in the Norteño chain of command. [Citations.]" (*Id.* at p. 77.) Alternatively, "[s]ubsets may also be linked together as a single 'criminal street gang' if their independent activities benefit the same (presumably higher ranking) individual or group. An example would be various Norteño subset gangs that share a cut of drug sale proceeds with the same members of the Nuestra Familia prison gang. More indirect evidence may also show that distinct gang subsets are organizationally linked. For instance, proof that different Norteño subsets are governed by the same 'bylaws' may suggest that they function – however informally – within a single hierarchical gang. [Citation.]" (*Ibid.*)

Here, the prosecution did produce evidence of an associational and organizational connection between the various Norteño cliques or subsets in Visalia. Officer Logan testified that *all* street-level Norteños answer to a group called Nuestra Familia. The Nuestra Familia is "structured similar to ... the Italian Mafia, where you have a boss," except that the Nuestra Familia has three bosses in charge. Norteños are organized into "regiments" which are responsible for collecting money, selling narcotics, and committing murders and robberies to generate money for influential "generals" in charge of Nuestra Familia. "Pistol" Pete Sanchez from Porterville was the "commander" of the regiment in Tulare County. His "boss" was Jose Martinez (aka "Slow Joe") from Porterville, who was in charge of all Tulare County. Martinez, in turn, reported to a man named Sal Castro.

Nuestra Familia has directed the Norteño cliques in Tulare County – including the North Side Visa and Woodlake cliques – to work together. Unlike Los Angeles area gangs which claim certain city blocks as "their turf," all Norteños groups in the area "function as one" under the singular Norteño umbrella. While some Norteños will identify with a particular neighborhood, they are still "all Norteños." "They get along. They can make crimes together. They hang out together."

Similarly, Saucedo himself testified that while there are "many gangs in Visalia," they are all Norteños. He said, "It's all the same thing. It don't matter if you're from Visalia, Woodlake, Sacramento.

It don't matter. It's still the same thing. It doesn't matter where you're from."

Franco also testified that *all* "sets" of Norteños follow the directions of the bosses of Nuestra Familia. As a result, it is not uncommon for Norteños from Woodlake, Visalia, and Farmersville to work together. Franco also said that *all* sets of Norteños live by the same 14 "bonds" or rules.

Because the prosecution produced evidence supporting an organizational and associational nexus between all Norteño cliques in Visalia, *Prunty* was not violated.

**V. There was Substantial Evidence that Norteños Satisfied the "Primary Activities" Requirements of Section 186.22**

Defendant contends there was insufficient evidence to support the primary activity requirements of section 186.22. We disagree.

"Proof that a gang's members consistently and repeatedly have committed criminal activity listed in section 186.22, subdivision (e)[ (1)–(25), (31)–(33) ] is sufficient to establish the gang's primary activities." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1464–1465 (*Duran* ).) Among the crimes listed in subdivision (e)(1) to (25), (31) to (33) are assault with a deadly weapon or by means of force likely to produce great bodily injury, robbery, unlawful homicide, sale of controlled substances, felony vandalism, witness intimidation, and firearm possession. (§ 186.22, subd. (e).) Here, there was testimony that Norteños "consistently and repeatedly" have committed qualifying crimes.

Officer Logan was asked about his experience with Norteños before joining the gang suppression unit. Logan said his experience with Norteños consisted of "[i]nvestigating gang crimes, such as shootings, vandalisms, firearms possession, narcotics sales."

Officer Logan testified that Nuestra Familia "created pretty much an army [ (i.e., Norteños) ] *in order to* provide more influential people or the generals in charge of the Nuestra Familia, along with their members, with money. *That's all done by committing crimes*." (Italics added.) Logan explained that Norteños commit violent crimes because it will scare witnesses and victims, allowing them to commit burglaries and robberies.

Officer Logan also described "regiments," which "is just an organized group of these Norteños who are responsible for collecting money, *selling narcotics, hitting, or killing people, robberies. They function in order to make money to provide to the*

Nuestra Familia." (Italics added.) When Norteño gang members commit a robbery, they are expected to "kick back" money to the gang's chain of command. Logan also testified that Norteños sell narcotics "blatantly."

Officer Logan also explained that if a gang member does not provide certain paperwork to the gang, they will "be hit in what they call a removal." "It's a *physical assault* by [ ] upwards of many members with makeshift knives, known as shanks within the walls of the prison system. But they're gonna hit you and they're gonna do what they can do to either severely injure you or kill you."

Moreover, "[p]ast offenses, as well as the circumstances of the charged crime, have some tendency in reason to prove the group's primary activities, and thus both may be considered by the jury on the issue of the group's primary activities. [Citation.]" (*Duran*, *supra*, 97 Cal.App.4th at p. 1465.) Officer Logan described seven predicate offenses, including several unlawful homicides. (Discussion § IV, *ante*.) And the circumstances of the present offense illustrate another murder and firearm possession committed by a Norteño.

In sum, Officer Logan's testimony supported an inference that Norteños "consistently and repeatedly have committed" (*Duran*, *supra*, 97 Cal.App.4th at p. 1464) assaults with a deadly weapon or by means of force likely to produce great bodily injury, robberies, unlawful homicides, selling controlled substances, felony vandalism, witness intimidation, and firearm possession. (See § 186.22, subd. (e).)

### A. Substantial Evidence Supported the Gang-relatedness Requirement of the Gang Enhancement

Defendant contends there was insufficient evidence of gang-relatedness. We disagree.

"To prove the [gang] enhancement with respect to an offense, the prosecution must show that offense was 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members ....' (§ 186.22, subd. (b)(1).) 'The enhancement ... requires proof that the defendant commit a gang-related crime ....' [Citation.]" (*People v. Pettie* (2017) 16 Cal.App.5th 23, 50.)

" 'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question ... is "whether, after viewing the evidence

in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] The California Constitution requires the same standard. [Citation.] 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence" ' [citation]." (*People v. Pettie*, *supra*, 16 Cal.App.5th at p. 47, original italics.)

There was substantial evidence supporting all of the following facts/inferences. Defendant, Saucedo and Franco, were in a car together. At the time, each of them associated with or were members of the Norteño criminal street gang. One of the "directives" of the Norteño gang was to attack Southern gang members on sight. The group's intention in driving around that day was to "get the opposition" – meaning Sureños. As defendant was driving, he said, " '[D]id you see that?' " and made an aggressive U-turn to pull up behind a vehicle with Pedro Nunez inside. Saucedo thought Nunez was a Southern gang member because "he was wearing blue shirt" and was bald. Defendant then walked up and shot Nunez. Based on these facts and inferences, a jury could reasonably conclude the crime was gang-related.

Certainly, as defendant notes, there are other factors that do not suggest gang-relatedness (e.g., absence of gang colors or epithets). But on substantial evidence review, " '[i]t is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion.' [Citation.]" (*People v. Ghipriel* (2016) 1 Cal.App.5th 828, 832.)

(Doc. No. 12-15 at 23-31) (footnotes omitted).

### 2.  Analysis

The undersigned reviews the state court's reasoned decision under the deferential standard of review applying clearly established federal law.  The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable

1   to the prosecution, *any* rational trier of fact could have found the essential elements of the crime

2   beyond a reasonable doubt." *Id.* at 319 (emphasis in original); *see also Coleman v. Johnson*, 566

3   U.S. 650, 656 (2012) ("the only question under *Jackson* is whether that finding was so

4   insupportable as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2

5   (2011) (a reviewing court "may set aside the jury's verdict on the ground of insufficient evidence

6   only if no rational trier of fact could have agreed with the jury").

7       The *Jackson* standard "must be applied with explicit reference to the substantive elements

8   of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

9   408 F.3d 1262, 1275-76 (9th Cir. 2005). The reviewing court should look to state law for the

10   elements of the offense and then turn to the federal question of whether any rational trier of fact

11   could have found the essential elements of the crime supported by sufficient evidence beyond a

12   reasonable doubt. *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

13       Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

14   under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012). As noted by

15   the Supreme Court:

16

17       First, on direct appeal, "it is the responsibility of the jury−not the
        court−to decide what conclusions should be drawn from evidence
        admitted at trial. A reviewing court may set aside the jury's verdict

18       on the ground of insufficient evidence only if no rational trier of
        fact could have agreed with the jury." And second, on habeas

19       review, "a federal court may not overturn a state court decision
        rejecting a sufficiency of the evidence challenge simply because the

20       federal court disagrees with the state court. The federal court
        instead may do so only if the state court decision was 'objectively

21       unreasonable.' "

22   *Coleman*, 566 U.S. at 651.

23       California Penal Code § 186.22(b) provides for a sentencing enhancement when an

24   individual is convicted of a felony committed for the benefit of, at the direction of, or in

25   association with a criminal street gang, with the specific intent to promote, further, or assist in

26   criminal conduct by gang members. "Criminal street gang" is statutorily defined as an "ongoing,

27   organized association or group of three or more persons, whether formal or informal" who have at

28   least one of its "primary activities" the commission of one or more crimes specified elsewhere in

21

1   the statute, who share a common name or common identifying sign or symbol, and whose

2   members collectively engage in, or have engaged in, a pattern of criminal gang activity. Cal.

3   Penal Code § 186.22(f).  For the enhancement to apply, the prosecution must prove that the

4   defendant "sought to benefit that particular gang when committing the underlying felony."

5   *People v. Prunty*, 62 Cal. 4th 59, 67 (2015).

6         Here, the state court, although not citing directly to *Jackson*, applied the *Jackson* standard

7   and reasonably determined there was sufficient evidence to support the jury's determination that

8   Petitioner was a member of the Norteño gang and acted to further the activities of and for the

9   benefit or at the direction of the gang to warrant the § 186.22(b) enhancement.  While arguing

10  that there was insufficient evidence to support the umbrella-gang theory that all Norteño gangs

11  were connected, Petitioner recognizes that Logan, Saucedo, and Franco all provided testimony to

12  support this conclusion as well as evidence that Petitioner identified himself as a "Northerner" or

13  "north" associate for jail classification.  (Doc. No. 1 at 23-24).  Specifically, Logan testified all

14  Norteño street gang members are part of a larger umbrella group.  (Doc. 16-1 at 84).  Saucedo

15  testified that "Norteño gang members in Woodlake call themselves" Norteños and it does not

16  matter "if you're from Visalia, Woodlake, Sacramento" because "[i]t's still the same thing."

17  (Doc. No. 12-18 at 169).  Franco testified that the Norteños had rules and a tax system, and all the

18  Norteños throughout the state followed the direction of Nuestra Raza and Nuestra Familia.  (Doc.

19  No. 12-7 at 183-84, 195).

20        Concerning the evidence to support the primary activities element, Logan reviewed seven

21  crimes committed by Norteños and testified regarding the facts of those crimes.  (*See* Doc. 16-1 at

22  90).  These crimes included murder, attempted murder, voluntary manslaughter, and felony

23  assault with a deadly weapon, all linked to Norteños gangs.  (*Id.* at 90-99).  Logan explained that

24  by committing acts of violence, the gangs had "a lot less people wanting to come forward to

25  testify" so the gangs could continue to commit other crimes to obtain monetary proceeds.  (*Id.* at

26  80).  Killing Southern gang members also boosted a member's reputation in the gang and boosted

27  the reputation of the gang as a whole.  (*Id.* at 103).

28

1   As to whether there was evidence to support that the crime was gang directed or

2   associated, Petitioner cites Logan's testimony that the offense was a "crime of opportunity" and

3   testimony from himself, Franco, and Saucedo that there was no discussion or instruction to kill

4   someone that day.  (Doc. No. 1 at 26).  However, Franco testified that one of the directives of the

5   Norteño gang was to attack Southerner gang members on sight.  (Doc. No. 12-7 at 232).

6   Southerners were primarily Hispanic and were associated with the color blue.  (*Id.*at 224-26).

7   Logan also testified that Southern gang members would typically shave their heads and wear

8   blue.  (Doc. 16-1 at 101).  Nunez was Hispanic, bald, and wearing a blue shirt such that he could

9   be perceived as a Southern gang member.  (Doc. No. 12-8 at 79, 102).

10   Viewing all this evidence in the light most favorable to the prosecution, it was objectively

11   reasonable for the state appellate court to determine that there was substantial evidence to support

12   the gang enhancement.  As such, the state appellate court's rejection of Petitioner's sufficiency of

13   the evidence claims was not contrary to, or an unreasonable application of, clearly established

14   Supreme Court precedent, nor an unreasonable determination of the facts.  The undersigned

15   recommends that grounds two, three, and six be denied.

16   **C.    Ground Four-*Prunty* Instruction**

17   In ground four, Petitioner argues the trial court failed to properly instruct the jury because

18   the instruction regarding the gang enhancement "failed to include the requirements established by

19   *Prunty* for establishing the existence of an alleged 'umbrella' gang."  (Doc. No. 1 at 28).

20   Petitioner asserts this error violated his right to due process.  (*Id.*).  Respondent argues ground

21   four fails to state a federal claim, and the state appellate court reasonably rejected this argument.

22   (Doc. No. 11 at 36).

23   **1.  State Court Decision**

24   Because "*Prunty* does not prohibit the prosecution from proving the defendant sought to

25   benefit a gang (i.e., the Norteños) while relying on predicate offenses by the *same* gang (i.e.,

26   Norteños)," the state appellate court rejected Petitioner's argument that the trial court erred in

27   failing to instruct the jury on *Prunty*'s organizational nexus requirement.  (Doc. No. 12-15 at 26).

28   The appellate court explained:

1      The prosecution in this case did not need to rely on an
       organizational nexus, because it adduced evidence that (1)
2      defendant intended to benefit Norteños and that (2) Norteños had
       committed sufficient predicate offenses. In other words, there was
3      evidence defendant intended to benefit one gang (i.e., Norteños),
       and sufficient predicate offenses were established for the same gang
4      (i.e., Norteños).

5      Defendant says Officer Logan "provided no evidence that members
       of the gangs that committed the predicate crimes behaved in a
6      manner that conveyed their identification with the larger association
       that appellant allegedly sought to benefit." Even assuming
7      defendant's characterization of the evidence was accurate, it would
       not be dispositive. In order to qualify as a predicate offense, the
8      gang members involved need not "convey [] their identification"
       with the gang. Indeed, predicate offenses need not be gang-related
9      at all. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621-622,
       disapproved on other grounds in *People v. Sanchez* (2016) 63
10     Cal.4th 665, 686, fn. 13 (*Sanchez*)) What matters is that the
       predicate offenses be committed by members of the gang. (See §
11     186.22, subd. (f) [part of definition of criminal street gang is that its
       "members individually or collectively engage in, or have engaged
12     in, a pattern of criminal gang activity."]) And that was satisfied here
       as to the Norteño gang because Logan identified multiple predicate
13     offenses committed by Norteños. Whether those Norteños
       conveyed their identification as gang members during those crimes
14     is irrelevant. (*See People v. Gardeley*, *supra*, 14 Cal.4th at p. 610
       [predicate offenses need not be gang-related].)
15
       Because Logan's testimony established predicate offenses for the
16     Norteño gang, and there was sufficient evidence defendant sought
       to benefit the Norteño gang with his conduct, an organizational
17     connection between subsets was not required.

18     (*Id.* at 26 n.12).

19                    **2. Analysis**

20          To the extent ground four relies on state law, it is not a cognizable ground for federal

21     habeas relief. "[T]he fact that the instruction was allegedly incorrect under state law is not a basis

22     for habeas relief." *Estell v. McGuire*, 502 U.S. 62, 72 (1991). Thus, Petitioner is not entitled to

23     relief on his instructional error claim.

24          In the alternative, federal habeas relief is only appropriate where "the ailing instruction by

25     itself so infected the entire trial that the resulting conviction violates due process." *Id.* In making

26     this determination, the instruction must "be considered in the context of the instructions as a

27     whole and the trial record." *Id.*

28

Here, even if ground four could be construed as asserting a federal claim, Petitioner has not shown that the alleged error in failing to instruct the jury under *Prunty* so infected the trial as to deny him due process.  As concluded above, a rational trier of fact could have found Petitioner was a member of and acted for the benefit of the Norteño gang when committing the charged crimes and all of the predicate offenses relied upon were committed by the Norteño gang.  Accordingly, as such, the state court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  Thus, the undersigned recommends that ground four be denied.

### D.    Ground Five-Testimonial Hearsay

In ground five, Petitioner asserts that Logan's reliance on hearsay reports of other officers to support the gang enhancement violated *People v. Sanchez*, 63 Cal. 4th 665 (2016) and the confrontation clause.  (Doc. No. 1 at 29).  Respondent argues Petitioner's claim fails because "the Supreme Court has never held that an expert's reliance on testimonial hearsay in forming his opinions violates the Constitution" such that the appellate court's rejection of Petitioner's claim cannot be contrary to, or an unreasonable application of, clearly established federal law.  (Doc. No. 11 at 41).

### 1.  State Court Decision

The state appellate court addressed Petitioner's *Sanchez* claim as follows:

> Defendant claims Officer Logan's testimony violated *Sanchez*, *supra*, 63 Cal.4th 665.
>
> With certain exceptions, *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), held "the admission of testimonial hearsay against a criminal defendant violates the Sixth Amendment right to confront and cross-examine witnesses." (*People v. Sanchez*, *supra*, 63 Cal.4th at p. 670.) To trigger *Crawford*, the evidence in question must be both testimonial and hearsay. Even testimonial evidence is admissible under the confrontation clause if it is not hearsay. (See *Sanchez*, at p. 674 [the confrontation clause " 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]".) As a result, before *Sanchez*, prosecutors would sometimes argue that statements relied upon by a gang expert were offered not for their truth, but rather as a basis for the expert's opinion. (See Evid. Code, §§ 801–802.) *Sanchez* rejected that notion, holding that "[w]hen an expert relies on hearsay to provide case-specific facts,

25

considers the statements as true, and relates them to the jury as a reliable basis for the expert's opinion, it cannot logically be asserted that the hearsay content is not offered for its truth." (*Sanchez*, at p. 682.) However, *Sanchez* did not "call into question the propriety of an expert's testimony concerning background information regarding his knowledge and expertise and premises generally accepted in his field." (*Id*. at p. 685.)

In sum, this first prong of *Sanchez* has us ask whether the statements relied upon and conveyed by the expert involved "case-specific facts" or "background information." If the statements solely concern background information, the confrontation clause poses no barrier to admission. However, if the statements convey case-specific facts, we must move to the "second prong of the analysis . . . " and determine whether the statements were testimonial. (*Sanchez*, *supra*, 63 Cal.4th at p. 687.)

"Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez*, *supra*, 63 Cal.4th at p. 689, fn. omitted.)

If the statements are not hearsay, they are admissible. If the statements are nontestimonial hearsay, then their admission "may constitute state law statutory error." (*Sanchez*, *supra*, 63 Cal.4th at p. 698.) The confrontation clause is only implicated when the statements are both testimonial and hearsay.

The latter is the type of claim defendant presents here. He claims Officer Logan's statements were testimonial hearsay. But defendant does not explain on an individual level why each fact related by Logan was testimonial hearsay. Instead, he "incorporates by reference" the entire summary of Logan's predicate-crimes testimony and deems it all to be testimonial hearsay. As described above, the determination of whether a statement is testimonial hearsay is a fact-intensive sufficiently developed. Moreover, an essential premise of defendant's argument is that Logan's testimony was based on "police reports authored by non-testifying officers." But he provides no citation to the record for that claim. Accordingly, we reject defendant's claim because it is "not supported by meaningful analysis with record citations . . . ." (*People v. Miranda* (2016) 2 Cal.App.5th 829, 837.)

Moreover, we note that our review of Officer Logan's predicate offense testimony demonstrates that many of Logan's statements are not expressly attributed to "police reports authored by non-testifying officers." At the outset of the predicate offense testimony, the prosecutor asked Logan, "For purposes of this case, did we have you take a look at approximately seven cases, seven crimes?" to which Logan responded, "Yes." For the first predicate offense, Logan was shown an exhibit and asked if it was "a certified conviction from a crime that occurred January 7, 2007, in Cutler." Logan responded that it was. Logan was then asked, "Are you familiar with the underlying facts of that particular case?" to which Logan responded, "Yes, I am."

26

Logan was then asked, "What do they involve?" to which Logan responded by describing the predicate offense. Logan's testimony regarding the other predicate offenses generally followed a similar pattern.

While Officer Logan did authenticate a prosecution exhibit at the outset of his testimony on each predicate offense, it is far from clear that his knowledge of each case was derived from the exhibit, rather than personal knowledge. That is, Logan's familiarity with the underlying facts could have been derived solely from reviewing police reports and/or other documents for the seven cases the prosecutor told him to look at. Or, Logan's familiarity with the facts of the predicate offenses could have resulted from personal involvement in responding to, investigating or making arrests in some or all of those cases during his 10 years working as a sworn peace officer. The record simply is not clear in this regard.

One reason the record is not clear on this point is that defense counsel did not object on confrontation clause grounds during Officer Logan's predicate offense testimony. "Had defendant lodged contemporaneous objections during trial, the People, as the proponent of the evidence, would have had the burden to show the challenged testimony did not relate testimonial hearsay. [Citations.]" (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 584.) "However, as no such contemporaneous objections were lodged, we cannot simply assume" (*id*. at p. 585, fn. omitted) the statements at issue were testimonial hearsay. To the contrary, error must be affirmatively shown by the record. (*Ibid*., citing *People v. Giordano* (2007) 42 Cal.4th 644, 666.) "[D]ue to defendant's failure to object, the record is not clear enough for this court to conclude which portions of the expert's testimony involved testimonial hearsay. Accordingly, defendant has not demonstrated a violation of the confrontation clause." (*Ochoa*, *supra*, at p. 586.)

(Doc. 12-15 at 31-35 (footnotes omitted)).

## 2. Analysis

To the extent Petitioner claims that the state appellate court's application of *Sanchez* was in error, his claim is based on an error of state law and therefore not cognizable on habeas review. *Estelle*, 502 U.S. at 67. Though *Sanchez* applies and interprets the United States Constitution to provide additional protections to criminal defendants in California, these additional protections have not been adopted by the United States Supreme Court. *See Chavez v. Sullivan*, 831 F. App'x 234, 235 (9th Cir. 2020) (finding that petitioner's claim that the trial court violated *Sanchez* was not a violation of clearly established federal law as petitioner failed to "cite any U.S. Supreme Court decision applying *Crawford* in the same manner as *Sanchez*").

1    Petitioner is also not entitled to relief on his confrontation clause claim.  The Sixth

2    Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall

3    enjoy the right . . . to be confronted with the witnesses against him . . .."  U.S. Const., Amend. VI.

4    A federal habeas petitioner may be granted relief on a confrontation clause claim if he can prove a

5    Sixth Amendment violation under *Crawford v. Washington*, 541 U.S. 36, 59 (2004).  The

6    confrontation clause bars "admission of testimonial statements of a witness who did not appear at

7    trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-

8    examination" regardless of whether the statements are deemed reliable.  *Crawford*, 541 U.S. at

9    53-54 (2004); *Davis v. Washington*, 547 U.S. 813, 821(2006).  In general, testimonial statements

10    are "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some

11    fact."  *Crawford*, 541 U.S. at 51.  However, the confrontation clause "does not bar the use of

12    testimonial statements for purposes other than establishing the truth of the matter asserted."  *Id*. at

13    59, n.9.; *Tennessee* v. *Street,* 471 U.S. 409, 414 (1985).  "Out-of-court statements that are related

14    by [an] expert solely for the purpose of explaining the assumptions on which [his expert] opinion

15    rests are not offered for their truth and thus fall outside the scope of the confrontation clause."

16    *See Williams v. Illinois*, 567 U.S. 50, 58 (2012).

17    Here, the state appellate court's decision was not contrary to or an unreasonable

18    application of federal law.  The state appellate court correctly identified and applied *Crawford*,

19    which is the clearly established federal law applicable to confrontation claims involving hearsay.

20    While Petitioner argues the "non-testifying authors of reports from which Logan derived his

21    testimony were unidentified" and hearsay statements were admitted, the appellate court noted that

22    it was not clear Logan's knowledge came from reviewing police reports rather than his own

23    personal involvement.  (Doc. No. 12-15 at 34).  Thus, Petitioner has not shown that any

24    testimonial statements were admitted.  Accordingly, the undersigned recommends that ground

25    five be denied.

26    **E.    Ground Seven-Aiding and Abetting**

27    In ground seven, Petitioner argues the trial court erred when it instructed the jury

28    concerning aiding and abetting because the evidence did not support such an instruction.  (Doc.

28

No. 1 at 33-35). Respondent argues this claim is not cognizable because it relies on state law and is also without merit because the state appellate court did not unreasonably apply any Supreme Court precedent and concluded any constitutional error was harmless.  (Doc. No. 11 at 47-48).

### 1.  State Court Decision

The appellate court rejected Petitioner's challenge to the aiding and abetting instruction, holding:

> II. The Trial Court did not Err in Instructing the Jury on Aiding and Abetting
>
> …
>
> 1. Law
>
> Direct perpetrators, and those who aid and abet them, are both punished as "principals" to the crime. (§ 31; see also § 971; *People v. Smith* (2014) 60 Cal.4th 603, 613.) " 'An aider and abettor is one who acts "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." [Citation.]' [Citation.]" (*People v. Smith*, *supra*, at p. 611.)
>
> It is error to instruct the jury on a principle of law that has no application to the facts of the case at trial. (*People v. Hesslink* (1985) 167 Cal.App.3d 781, 792.)
>
> 2. Issue
>
> Defendant contends there is not substantial evidence supporting an aiding and abetting theory of liability and, as a result, it was error to give the inapplicable instructions. We disagree.
>
> 3. Application
>
> The evidence adduced at trial raised the following inferences, among others. Saucedo, Franco and defendant associated with the Norteño criminal street gang. Their intention that day was to go "get" Sureños. Defendant drove the group and pulled behind a vehicle whose occupant looked like a Sureño. Franco then shot the victim several times. This evidence permits an inference that defendant aided and abetted Franco in murdering the victim.
>
> Certainly, some trial evidence raised other, incompatible inferences. For one, the evidence that defendant was the shooter was arguably stronger than the evidence he merely aided and abetted Franco. But we are only reviewing whether it was appropriate to *instruct* on aiding and abetting. We merely conclude that because there was *some* substantial evidence supporting an aiding and abetting theory, the instruction was *relevant* to the facts of the case.

29

> Moreover, we do not believe the instruction had any prejudicial effect. The jury's verdicts included a finding that defendant *personally* discharged a firearm causing great bodily injury to Nunez. While the jury's questions during deliberations shows that at least some jurors preliminarily entertained the theory defendant was an aider and abettor rather than the direct perpetrator, the subsequent, unanimous verdict that defendant *personally* discharged a firearm causing great bodily injury to Nunez shows that the jury ultimately rejected accomplice liability. Even if the court's aiding and abetting instruction had been unwarranted, it would not have been prejudicial if the jury rejected the theory.

(Doc. No. 12-15 at 12-22 (footnote omitted)).

### 2. Analysis

To reiterate, for Petitioner to obtain federal habeas relief for jury instructional error, Petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72. Here, Petitioner cannot meet that burden. As indicated by the state appellate court, the jury concluded Petitioner *personally* discharged a firearm causing great bodily injury to Nunez. (Doc. No. 12-3 at 191). Thus, the jury did not rely on the aiding and abetting instruction in convicting Petitioner such that any error in giving the instruction was harmless. Accordingly, the undersigned recommends Enriquez's seventh ground be denied.

### F.    Ground Eight-Accomplice Testimony

In his final ground for relief, Petitioner claims Franco was an accomplice whose testimony was not corroborated as required to support a conviction under California Penal Code § 1111. (Doc. No. 1 at 37). Because Franco's testimony was not corroborated, Petitioner asserts his conviction violated due process because there was insufficient evidence to support his conviction. (*Id.*). Respondent argues ground eight is not cognizable on federal habeas review. (Doc. 11 at 48).

### 1. State Court Decision

The state appellate court rejected Petitioner's § 1111 claim, addressing it as follows:

> III. Franco's Testimony was Sufficiently Corroborated Under Section 1111
>
> An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which

30

the testimony of the accomplice is given." (§ 1111.)

The testimony of an accomplice must be "corroborated" by other evidence. (§ 1111.) The other evidence must do more than show a crime was committed. It must "tend to connect the defendant with the commission of the offense." (*Ibid.*)

" 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense. [Citations.]' [Citation.] The evidence 'is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 370.)

Defendant contends that Franco was an accomplice and that his testimony was not sufficiently corroborated by other evidence. We disagree. Defendant and Saucedo both testified defendant was the driver of the Dodge Caliber. And the testimony of percipient witness, Richard G., raised a strong inference that the driver of the Dodge Caliber was the shooter. Richard testified that when he saw the Dodge Caliber and victim's vehicle, the front *driver's door* on the Dodge Caliber was open and a man was approaching the white vehicle. Richard then heard two gunshots and saw a person standing with his hand inside of the white car. As the person withdrew his hand, and Richard saw he was carrying a black, small-caliber gun. The shooter then entered the *driver's door* of the Dodge Caliber and "took off" eastbound on Mill Creek.

This evidence is more than enough to corroborate Franco's testimony.

Defendant details substantial evidence suggesting Franco might have been the shooter. We agree that some evidence suggested Franco could have been the shooter. But that is not the question we face. We must determine whether *Franco*'s version of events was corroborated with evidence connecting defendant with the crime. Because it was, our inquiry ends.

(Doc. No. 12-15 at 22-23).

### 2.  Analysis

Petitioner's ground eight relies on an alleged violation of California Penal Code § 1111,

requiring corroboration of accomplice testimony.  However, this is a "state law requirement"

which is "not required by the Constitution or federal law."  *Laboa v. Calderon*, 224 F.3d 972, 979

(9th Cir. 2000).  Thus, Petitioner fails to raise a cognizable federal claim.  *Wilson*, 562 U.S. at 5.

To the extent Petitioner's ground eight can be construed as a challenge to the sufficiency

of the evidence, his claim still fails.  The state appellate court detailed the evidence that

corroborated Franco's testimony that Petitioner was the shooter, including Petitioner and

1    Saucedo's testimony that Petitioner drove the vehicle and a witness's testimony that the driver's

2    side front door was open, a man approached the other vehicle, two gunshots were heard, a gun

3    was visible, and the shooter returned to the driver's door before driving off.  (Doc. 12-15 at 22).

4    The state appellate court concluded this testimony corroborated Franco's testimony.  (*Id.*).  Thus,

5    because a rational trier of fact could conclude Petitioner was the shooter, the state court's

6    rejection of this claim was not contrary to, or an unreasonable application of, clearly established

7    Supreme Court precedent.  *Jackson*, 443 U.S. at 319.  Accordingly, the undersigned recommends

8    ground eight be denied.

9                        **V.  CERTIFICATE OF APPEALABIILTY**

10           A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

11    court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

12    *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

13    district court to issue or deny a certificate of appealability when entering a final order adverse to a

14    petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

15    Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

16    showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

17    the petitioner to show that "jurists of reason could disagree with the district court's resolution of

18    his constitutional claims or that jurists could conclude the issues presented are adequate to

19    deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.

20    McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing

21    of the denial of a constitutional right, the undersigned recommends that the court decline to issue

22    a certificate of appealability.

23           Accordingly, it is **RECOMMENDED**:

24    1.  Petitioner be DENIED all relief on his Petition for Writ of Habeas Corpus (Doc. No.

25         1); and

26    2.  Petitioner be denied a certificate of appealability.

27                        **NOTICE TO PARTIES**

28    These Findings and Recommendations will be submitted to the United States District

1   Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

2   after being served with a copy of these Findings and Recommendations, a party may file written

3   objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

4   "Objections to Magistrate Judge's Findings and Recommendations" and shall not exceed **fifteen**

5   **(15) pages**.  The Court will not consider exhibits attached to the Objections.  To the extent a party

6   wishes to refer to any exhibit(s), the party should reference the exhibit in the record by its

7   CM/ECF document and page number, when possible, or otherwise reference the exhibit with

8   specificity.  Any pages filed in excess of the fifteen (15) page limitation may be disregarded by

9   the District Judge when reviewing these Findings and Recommendations under 28 U.S.C. §

10  636(b)(l)(C).  A party's failure to file any objections within the specified time may result in the

11  waiver of certain rights on appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

12

13  Dated:    January 28, 2025

14                                                      HELENA M. BARCH-KUCHTA
                                                        UNITED STATES MAGISTRATE JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28

33